Filed 10/1/13  In re I.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>    Defendant and Appellant. | E058647<br><br>(Super.Ct.No. J233243)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Cheryl C. Kersey, Judge. Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

A.M. (mother) appeals from an order terminating parental rights to her preschool-aged son I.M. (sometimes child). She argues that the juvenile court should have applied the "beneficial parental relationship" exception to termination. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).) She also appeals from an order made at the same hearing denying her "changed circumstances" petition pursuant to Welfare and Institutions Code section 388 (section 388). We find no error. Hence, we will affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In May 2010, when I.M. was four months old, he was admitted to Loma Linda University Medical Center with symptoms of liver failure. His treating physician believed that he needed a liver transplant and recommended diagnostic surgery (including a liver biopsy) to confirm this.

The mother was argumentative and uncooperative. She wanted to take the child home, against medical advice. She refused to consent to the diagnostic surgery, even though she was told that I.M. could die if not treated properly; she "showed more concern about the scar from the procedure than the child's health." She asked a nurse to take out the child's intravenous line (IV); the nurse refused. "A few minutes later," it was found that the IV had been removed. The mother claimed that the child did it himself.

2

When a social worker interviewed the mother, she claimed that "all [the] doctors, nurses, and staff had it in for her, and were all lying about her." "She believed there was nothing wrong with [I.M.], and . . . the doctors were using him to experiment on." She also accused the social worker of "watching her from outside of her house . . . ."[1]

The social worker's investigation revealed that the mother had a history of mental illness and drug abuse. She had a prior conviction for child endangerment. Two of her older children had been removed from her custody — one voluntarily (i.e., in a guardianship) and one involuntarily (i.e., in a dependency).

---

[1] The facts in the preceding two paragraphs are according to the report for the detention hearing.

According to the report for the jurisdictional/dispositional hearing, however, which was prepared by a different social worker, the mother flatly denied these asserted facts. She gave a lengthy and detailed account of her efforts to attend diligently to I.M.'s medical needs. To the extent that the second social worker was able to contact the medical professionals involved, they confirmed the mother's account. Moreover, the second social worker "ha[d] consistently observed the mother . . . to be respectful, of appropriate affect and mood, and ha[d] not witnessed any paranoia, incoherence, or delusion[al] thought."

Nevertheless, because the mother had a history of mental health issues, and because both the original social worker and hospital staff reported that the mother had displayed "paranoia," "delusion," and "'bizarre' and 'incoherent' behaviors," the second social worker concluded that there had been "medical neglect" and that I.M. had to be removed from the mother's custody to ensure his safety.

The mother also told the second social worker that "she was in agreement with the allegations [of the petition] and . . . she understands the Department's concern for the well[-]being of [I.M.] . . . ."

In June 2010, San Bernardino County Children and Family Services (Department) detained I.M. and filed a juvenile dependency petition concerning him.[2]

The full name and the whereabouts of I.M.'s father were unknown and remained unknown throughout the dependency.

While awaiting a liver transplant, I.M. was released from the hospital and placed in a foster home for medically fragile children.

In July 2010, the mother "got into a physical altercation" with her boyfriend's ex-girlfriend. As a result, she was arrested for assault with a deadly weapon. In August 2010, pursuant to a plea bargain, she pleaded guilty to an unspecified charge (possibly battery) and was placed on probation.

In September 2010, I.M. received a liver transplant.

In October 2010, at the jurisdictional/dispositional hearing, the mother submitted on the social worker's reports. The juvenile court found that it had jurisdiction based on failure to protect (Welf. & Inst. Code, § 300, subd. (b)) and, solely as to the father, failure to support (*id*., § 300, subd. (g)). It formally removed I.M. from the mother's custody.

While there were no further reports of the mother being delusional, she seemed "to need constant guidance and reassurance when completing simple tasks and in the everyday decision making process." There were concerns that she did not understand the severity of I.M.'s condition. According to a psychological evaluation, she tended to

---

[2] The mother also had a two-year-old daughter, who was detained at the same time and made the subject of a separate dependency. She is not a party to this appeal.

4

blame others and to minimize her own responsibility. "[S]he . . . exhibit[s] overly valued ideas in which she is heavily invested, that border on delusional beliefs, and she appears to deny, in an unconscious manner, past realities that inconveniently conflict with her current presentation." She had "narcissistic-like tendencies to . . . become preoccupied with her own needs at the expense of concern about the needs of others." She had an "oppositional tendency" due to "underlying feelings of anger and resentment . . . ." She was likely to be "overwhelmed" by caring for a child like I.M.

The mother and the foster mother had a "strained relationship." The foster mother did not keep the mother informed about I.M.'s condition. She was highly critical of the mother's ability to provide medical care for I.M. For example, she complained that the mother could not administer his medication without referring to her notes. However, the foster mother also refused to train the mother in the mother's home (because she did not feel safe or comfortable there), in her own home (because the mother had a criminal record), or in the Department's office (because it was unsanitary).

As a result of this tension, in October 2011, I.M. was moved to a different foster home (also for medically fragile children). With the first foster mother out of the picture, the mother started to make better progress toward reunification. In December 2011, she began having unsupervised overnight and weekend visits. She was described as "proficient" in managing I.M.'s medical care. Thus, in April 2012, I.M. was placed with the mother on an "extended visit."

Later in April 2012, however, during an argument, the mother hit her boyfriend in the mouth, giving him a split lip. She was arrested for inflicting corporal injury on a cohabitant. (Pen. Code, § 273.5, subd. (a).) The child was placed back in his foster home. The mother pleaded nolo contendere and was released on probation.

In May 2012, at the 18-month review hearing, the juvenile court terminated reunification services. It did not set a hearing pursuant to Welfare and Institutions Code section 366.26 (section 366.26), but only because there were, as yet, no identified prospective adoptive parents.

In October 2012, the mother gave birth to another child, who was immediately removed from her custody and became the subject of a separate dependency.

Meanwhile, in October 2012, prospective adoptive parents were located. In December 2012, after a two-week "integration period," I.M. was placed with them. Accordingly, also in December 2012, the juvenile court set a section 366.26 hearing.

Two days before the date set for the section 366.26 hearing, the mother filed a section 388 petition. The juvenile court set a hearing on the petition for the same date as the section 366.26 hearing. It specified that the hearing would be for argument as to whether the petition made a prima facie case — i.e., it would not be an evidentiary hearing.

In April 2013, at the combined hearing, after hearing argument, the juvenile court denied the section 388 petition. It then found that I.M. was adoptable and that there was no applicable exception to termination. Accordingly, it terminated parental rights.

6

## II

## SECTION 388 PETITION

The mother contends that the juvenile court erred by denying her section 388 petition without an evidentiary hearing.

A.     *Additional Factual and Procedural Background.*

In her section 388 petition, the mother asked the juvenile court to vacate the order setting a section 366.26 hearing and to return I.M. to her custody.

As changed circumstances, she alleged that she had completed a parenting class, counseling, and a medical assistant training program.  She also alleged that she had "benefit[ed]" from anger management and domestic violence classes.

After hearing argument, the trial court denied the section 388 petition.  It explained that "the request does not state new evidence or a change of circumstances . . . ."

B.     *Analysis.*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child.  [Citation.]  The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child.  [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 611-612 [Fourth Dist., Div. Two].)

"Section 388 petitions 'are to be liberally construed in favor of granting a hearing to consider the [petitioner]'s request. [Citations.] The [petitioner] need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] 'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.' [Citation.]" (*In re B.C.* (2011) 192 Cal.App.4th 129, 141; see also § 388, subd. (d).)

"The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. [Citation.]" (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 612.) " . . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319, original quotation marks corrected.) "'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' [Citation.]" (*In re Daniel C*. (2006) 141 Cal.App.4th 1438, 1445.)

The order that the mother was asking to change — the order setting a section 366.26 hearing — had been issued in December 2012. At that point, the mother had already completed her medical assistant training program (in April 2012) and counseling (in September 2012). Admittedly, she had not yet completed her parenting class, which she ultimately completed in February 2013. However, this class was not particularly relevant to the underlying causes of her failure to reunify with I.M. — most significantly,

8

it was not relevant to anger management or domestic violence, which had derailed I.M.'s extended visit.

The mother did claim, "I really did benefit from my . . . anger[ ]management, as well as domestic v[iol]ence classes." However, she did not say when she took these classes or whether she had completed them. Rather conspicuously, her petition included a certificate of completion for her parenting classes, but not for any other classes.

At the hearing on the petition, the mother's counsel offered to call her counselor to testify that she was "dealing with the issue of domestic violence . . . ."[3] Even if so, once again, counsel did not offer to prove that the mother had successfully completed this additional counseling.

The mother argues that the very fact that she had not had any "angry outbursts" since April 2012 was a changed circumstance. However, nearly two years had elapsed between her arrest for assault in July 2010 and her arrest for domestic violence in April 2012. A lapse of just one year was insufficient to constitute a meaningful changed circumstance.

In sum, then, her petition showed, at most, that her circumstances were changing, rather than changed. (See *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 ["[T]he petitioner must show *changed*, not changing, circumstances."].)

---

**3** This contradicted the petition itself, which alleged that the mother had completed counseling, and that the counseling had dealt with the issue of the mother's parenting of her older daughter.

Finally, the mother complains about the fact that the juvenile court did not conduct an evidentiary hearing. However, precisely because her petition failed to make out a prima facie case, it was not required to do so. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 641-642.)

## III

## BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION TO TERMINATION

The mother contends that the juvenile court should have found that the "beneficial parental relationship" exception applied. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)

A. *Additional Factual and Procedural Background.*

The evidence before the juvenile court at the section 366.26 hearing consisted of one particular social worker's report, plus the oral testimony of the mother and of the social worker. We confine our review to this evidence (see Welf. & Inst. Code, § 366.26, subd. (c)(1)), which showed the following.

When I.M. was initially removed from the mother's custody, he was about five months old. At the time of the section 366.26 hearing, he was three years old.

In December 2012, I.M. had been placed with prospective adoptive parents, the K.'s. He was "thriving" in their home. He called them "Mama" and "Daddy." He would "seek[] out Mr. or Mrs. K. for all of his emotional needs . . . ." They appeared to have "an in-depth understanding of their role in providing [for his] medical needs . . . ."

I.M. was friendly, outgoing, and polite. However, he had some "issues" with tantrums (possibly due to a medication he was taking). The K.'s had learned how to "redirect" him, "and this ha[d] proven to not only decrease the intensity of the tantrums, but ha[d] also resulted in a drastic decrease in the[ir] frequency . . . ."

Before I.M. was placed with the K.'s, the mother had had weekly supervised visitation. After the placement, she had supervised visitation twice a month, for two hours at a time. She had missed only one visit.

Usually, when I.M. first saw the mother, he would ask if she had brought him something to eat. She would bring him candy and cookies; often, he would eat too much of these, resulting in a stomach-ache.

During visits, she would play with him, read to him, and watch videos with him. I.M. appeared to enjoy the visits. He called the mother "A[.]-mom" or just "A[.]" He seemed happy to see her. However, he appeared equally happy to see the social worker. If he was hurt or angry or needed comfort, he sought out the K.'s, not the mother.

The K.'s reported that, after visits, I.M. went through "a period of more tantrums and whining behaviors."

The juvenile court found that the mother had maintained regular visitation and contact, but that I.M. would not benefit from continuing the relationship: "[T]he child has bonded to the [prospective adoptive] parents, and . . . the mother here has not occupied a parental role with this child, and it is more like a visitor-type relationship.

11

Obviously, he is happy to see [her], like he is happy to see the social worker, but it is not something that I can look at and say that there is a bond, parent and child."

B.      *Analysis*.

As a general rule, at a section 366.26 hearing, if the juvenile court finds that the child is adoptable, it must terminate parental rights.  (Welf. & Inst. Code, § 366.26, subds. (b)(1) & (c)(1).)  There is an exception to this rule, however, if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (*id*., subd. (c)(1)(B)) for one of six specified statutory reasons.  (*Id*., subd. (c)(1)(B)(i)-(vi).)  One such reason is that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id*., subd. (c)(1)(B)(i).)

"The 'benefit' prong of th[is] exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]"  (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)  "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]"  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 594.)

"[T]he parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits — the parent must show that he or she occupies a

12

parental role in the life of the child.  [Citation.]"  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)  "'Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.'  [Citation.]"  (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

"'The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions.  [Citation.]' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

The existence of a beneficial parent-child relationship is a factual issue; we review the trial court's findings on this issue for substantial evidence.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  "'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." [Citation.]'  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)  Thus, 'a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." [Citation.]  Unless the undisputed facts established the existence of a

13

beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed.' (*Bailey J.*, *supra*, at p. 1314.)

The mother argues that there was substantial evidence that the beneficial parental relationship exception applied. This turns the standard of review on its head. The issue is whether there was substantial evidence that the exception did *not* apply. As we will discuss, there was.

I.M. called the prospective adoptive mother "Mama"; he called the mother by her first name (sometimes, but not always, adding "Mom"). If he needed comfort, he went to the K.'s, not to the mother. While he seemed happy to see the mother, he seemed equally happy to see the social worker. After visits, he engaged in more tantrums and more whining. The juvenile court could properly find that the mother was, at most, a friendly visitor. Taken together, this added up to substantial evidence that it was the K.'s, and not the mother, who played the parental role in I.M.'s young life.

The mother argues that, earlier in the case, I.M. had had extended unsupervised visits with her, including overnights, with no apparent problems. However, she did not introduce any *evidence* of this at the section 366.26 hearing. In any event, the juvenile court could properly give more weight to recent visits than to visits over a year earlier.

Finally, the mother also argues that the juvenile court should have considered legal guardianship, rather than adoption, as the permanent plan. However, unless it found that one of the statutory exceptions to termination applied, it simply had no authority to do so. (See Welf. & Inst. Code, § 366.26, subd. (c)(1) ["the court shall terminate parental rights unless [an exception] applies . . . ."].)

IV

DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
                                                                                    J.

We concur:

McKINSTER
            Acting P. J.

MILLER
                    J.